# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CARL ROBIN KIRCHMANN, derivatively on behalf of SLACK TECHNOLOGIES, INC., | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| STEWART BUTTERFIELD, ALLEN SHIM, BRANDON ZELL, ANDREW BRACCIA, EDITH COOPER, SARAH FRIAR, JOHN O'FARRELL, CHAMATH PALIHAPITIYA, and GRAHAM SMITH, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| SLACK TECHNOLOGIES, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Carl Robin Kirchmann ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Slack Technologies, Inc. ("Slack" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Stewart Butterfield, Allen Shim, Brandon Zell, Andrew Braccia, Edith Cooper, Sarah Friar, John O'Farrell, Chamath Palihapitiya, and Graham Smith (collectively, the "Individual Defendants," and together with Slack, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Slack, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets. As for his complaint against the Defendants, Plaintiff alleges the following based upon personal

knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Slack, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

<u>**NATURE OF THE ACTION**</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Slack's directors and officers from June 20, 2019 through the present (the "Relevant Period") based on misleading statements and omissions made in connection with the Company's June 2019 initial direct offering of stock ("the Offering"), the subsequent failure to correct them, and insider sales made in connection with the Offering and after the offering, before the truth was exposed.

2.      Founded in 2009, Slack is a software company offering a "channels-based messaging" platform, or "App," intended to centralize data and communication within a workspace, thereby doing away with the need for emails.

3.      Slack provides different levels of service to users of its App, ranging from a basic version of its platform available for free to paid subscriptions that offer enhanced services. For the higher-end "Slack Plus" and "Enterprise Grid" users, Slack provides service level agreements ("SLAs"), which include a guarantee that the App will be up and running without disruption 99.99% of the time during a given fiscal quarter.

4.      For much of its history, Slack was a private company, originally doing business under the name "Tiny Speck." In or around 2013, Tiny Speck began developing the Slack App,

and subsequently rebranded itself as Slack. Upon its launch, the Slack App proved to be a runaway success, and the Company achieved remarkable, steady growth in the years leading up to the Offering.

5.     In early 2019, the Company's management began acting on plans to take the Company public. In lieu of a traditional initial public offering, or "IPO," in which a company issues new or existing shares to the public, Slack structured its Offering as a direct listing, in which Company insiders and pre-Offering investors would sell the Company shares they already owned to the public. Among other things, this allowed Company insiders and investors to sell their shares immediately in connection with the Offering, rather than having to wait to sell until the end of a predetermined lock-up period, as would have been the case with an IPO.

6.     On April 26, 2019, before the beginning of the Relevant Period, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement") in connection with the planned Offering. The Registration Statement was declared effective on June 7, 2019.

7.     Subsequently, on June 20, 2019, the Company filed with the SEC a Prospectus on Form 424B4 (the "Prospectus") in connection with the Offering. The Prospectus formed part of and was incorporated into the Registration Statement. The Prospectus, the Registration Statement, and all amendments thereto are collectively referred to herein as the "Offering Documents." The Company's stock began trading publicly on the New York Stock Exchange ("NYSE") that same day, and through the Offering, 283 million shares of stock were sold, which were initially priced at $38.50 per share.

8.     The Offering Documents discussed in detail the risks facing the Company with respect to providing service to Slack App users, stating, among other things, that the Company had

in the past and *may* in the future experience service disruptions, and that the Company *may not* always be able to provide the required levels of service uptime to users.

9.      However, these statements conveniently omitted certain crucial details—namely, that the Company had in fact failed to maintain its 99.99% uptime guarantee to users for seven out of the twelve months in 2018 alone, and that the possibility of continued disruptions in the future was not a mere hypothetical, but a serious risk that had already materialized due to existing vulnerabilities in Slack's software.

10.     Furthermore, the Offering Documents failed to disclose that in the event of service disruptions, the Company's SLAs obligated the Company to pay users 100 times the value of the lost service—even to users who did not experience such disruptions or request refunds from the Company.

11.     Cracks began to appear in the narrative spun by the Individual Defendants a week after the Offering. On June 28, 2019, App users across the United States and Europe experienced severe service outages lasting roughly 15 hours.

12.     The Company addressed the outages in a short issue report posted on Slack's website, which emphasized that the Company would "ensure" that such outages did not happen again.

13.     Various news outlets reported on these outages, and the price of the Company's stock declined by 2.5%, falling from $37.50 per share at the close of trading on June 28, 2019, to $36.55 per share at the close of trading on July 1, 2019, the next trading day. The stock price continued to fall during the next several trading days, closing at $35.00 per share on July 8, 2019.

14.     On July 18, 2019, the Company reported to Slack App users that it would be resetting tens of thousands of user passwords in response to possible security vulnerabilities in the

App. On this news, the price of the Company's stock dropped by roughly 4.3%, falling from $33.46 per share at the close of trading on July 17, 2019 to $32.00 per share at the close of trading on July 18, 2019.

15.     On July 29, 2019, contrary to the Individual Defendants' assertions only a month prior, Slack App users experienced yet another significant service outage that lasted over an hour. On this news, the price of the Company's stock declined by roughly 1.3%, falling from $33.01 per share at the close of trading on July 29, 2019 to $32.58 per share at the close of trading on July 30, 2019.

16.     Importantly, in the wake of these developments, the Individual Defendants failed to issue statements correcting the above-referenced material misstatements and omissions in the Offering Documents, even as it became increasingly apparent to the investing public that key information relating to the Slack App had been concealed from the market.

17.     Finally, on September 4, 2019, the Company disclosed its financial results for the second fiscal quarter of 2019, revealing that the Company's revenue had been "negatively impacted by $8.2 million of credits related to service level disruption in the quarter."

18.     During a conference call held that day to discuss the Company's second quarter results, certain of the Individual Defendants admitted that the Company's "outrageously customer-centric" SLAs and the Company's unusually generous 99.99% uptime guarantee significantly contributed to the negative impact to the Company's earnings.

19.     Following the conference call, reporters and news outlets commented on the Individual Defendants' statements, revealing to the market, among other things, the excessive value of the service credits the Company had previously provided to users in connection with the

June and July 2019 outages, as well as the Company's previous failures to meet its 99.99% uptime guarantee during much of 2018.

20.      On this news, the price of the Company's stock plunged over the course of the next two trading days, tumbling from $31.07 per share at the close of trading on September 4, 2019 to $27.38 per share at the close of trading on September 6, 2019, a decline of almost 12%. The Company's stock price continued to dwindle during the following trading day, closing at $24.92 per share on September 9, 2019.

21.      The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements in the Offering Documents regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company's Slack App contained certain vulnerabilities that had already caused significant service outages and other disruptions in the past; (2) the Company had already failed to meet its promised 99.99% uptime guarantee during seven out of the twelve months in 2018, and would be unable to meet its 99.99% uptime guarantee in the future; (3) the Company's SLAs were highly punitive and unusual for the industry, and during service disruptions provided credits to users worth approximately 100 times the value of lost service, even to users who did not experience the disruptions or request service credits; (4) as a result of the foregoing, the Company's financial results and overall prospects would be heavily impacted; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading.

22.     After the Offering, the Individual Defendants failed to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

23.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

24.     Furthermore, not only did six of the Individual Defendants breach their fiduciary duties by engaging in lucrative insider sales in connection with the Offering while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact, but three of the Individual Defendants continued to engage in insider transactions after the Offering, while the price of the Company's stock remained artificially inflated, and before the truth was exposed. In total, the Individual Defendants collectively sold over 14.7 million shares of Company stock during the Relevant Period, obtaining proceeds of over $579 million.

25.     In light of the Individual Defendants' misconduct, which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), its Chief Accounting Officer ("CAO"), six members of its Board of Directors (the "Board") along with one former director, and three venture capital firms that had invested in the Company prior to the Offering to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, and the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

26.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

27.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

28.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action.

29.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

30.     Venue is proper in this District because Slack is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

31.     Plaintiff is a current shareholder of Slack. Plaintiff has continuously held Slack common stock at all relevant times. Plaintiff is a citizen of Sweden.

**Nominal Defendant Slack**

32.     Slack is a Delaware corporation with its principal executive offices at 500 Howard Street, San Francisco, California 94105. Slack's shares trade on the NYSE under the ticker symbol "WORK." Slack's common stock is divided into publicly traded Class A stock, which confers one vote per share, and non-public Class B stock, which confers ten votes per share. Each share of Class B stock is convertible at any time into a share of Class A stock.

**Defendant Butterfield**

33.     Defendant Steward Butterfield ("Butterfield") is a co-founder of the Company and has served as the Company's CEO and Chairman of the Board since February 2009. According to the Prospectus, as of April 30, 2019, Defendant Butterfield beneficially owned 89,768,926 shares of the Company's Class B common stock, including shares subject to a voting proxy, which represented 17.8% of the Company's outstanding Class B shares as of that date.

34.     For the fiscal year ended January 31, 2019, Defendant Butterfield received $10,347,246 in compensation from the Company. This included $356,952 in salary, $9,798,113 in stock awards, $136,715 in non-equity incentive plan compensation, and $55,466 in all other compensation.

35.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Butterfield made the following sales of Class A Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 6/20/2019 | 1,358,409 | $39.63 | $53,831,031 |
| 6/21/2019 | 2,500 | $38.09 | $95,217 |
| 6/24/2019 | 2,500 | $36.42 | $91,050 |
| 6/25/2019 | 2,500 | $35.74 | $89,362 |
| 6/26/2019 | 2,500 | $36.88 | $92,200 |
| 6/27/2019 | 2,500 | $37.16 | $92,887 |

| | | | |
|---|---|---|---|
| 6/28/2019 | 2,500 | $36.70 | $91,750 |
| 7/1/2019 | 111,263 | $37.45 | $4,166,354 |
| 7/2/2019 | 2,500 | $36.43 | $91,075 |
| 7/3/2019 | 2,500 | $35.99 | $89,975 |
| 7/5/2019 | 2,500 | $35.70 | $89,250 |
| 7/8/2019 | 2,500 | $35.11 | $87,775 |
| 7/9/2019 | 2,500 | $35.14 | $87,850 |
| 7/10/2019 | 2,500 | $35.72 | $89,300 |
| 7/11/2019 | 2,500 | $35.00 | $87,500 |
| 7/12/2019 | 2,500 | $34.28 | $85,712 |
| 7/15/2019 | 2,500 | $34.73 | $86,824 |
| 7/16/2019 | 2,500 | $34.66 | $86,649 |
| 7/17/2019 | 2,500 | $34.36 | $85,900 |
| 7/18/2019 | 2,500 | $32.78 | $81,950 |
| 7/19/2019 | 2,500 | $32.17 | $80,425 |
| 7/22/2019 | 2,500 | $32.62 | $81,542 |
| 7/23/2019 | 2,500 | $34.38 | $85,950 |
| 7/24/2019 | 2,500 | $33.82 | $84,550 |
| 7/25/2019 | 2,500 | $33.83 | $84,575 |
| 7/26/2019 | 2,500 | $33.79 | $84,475 |
| 7/29/2019 | 2,500 | $33.34 | $83,337 |
| 7/30/2019 | 2,500 | $32.43 | $81,075 |
| 7/31/2019 | 2,500 | $33.59 | $83,975 |
| 8/1/2019 | 2,500 | $32.76 | $81,887 |
| 8/2/2019 | 2,500 | $31.09 | $77,725 |
| 8/5/2019 | 2,500 | $30.32 | $75,800 |
| 8/6/2019 | 2,500 | $31.57 | $78,912 |
| 8/7/2019 | 2,500 | $30.69 | $76,725 |
| 8/8/2019 | 2,500 | $31.19 | $77,975 |
| 8/9/2019 | 2,500 | $30.96 | $77,400 |
| 8/12/2019 | 2,500 | $31.14 | $77,850 |
| 8/12/2019 | 2,500 | $31.14 | $77,850 |
| 8/13/2019 | 2,500 | $31.35 | $78,375 |
| 8/14/2019 | 2,500 | $30.32 | $75,800 |
| 8/15/2019 | 2,500 | $30.39 | $75,975 |
| 8/16/2019 | 2,500 | $30.15 | $75,375 |
| 8/19/2019 | 2,500 | $31.10 | $77,750 |

| 8/20/2019 | 2,500 | $30.52 | $76,300 |
| 8/21/2019 | 2,500 | $30.99 | $77,475 |
| 8/22/2019 | 2,500 | $31.29 | $78,225 |
| 8/23/2019 | 2,500 | $30.09 | $75,225 |
| 8/26/2019 | 2,500 | $30.72 | $76,800 |
| 8/27/2019 | 2,500 | $30.45 | $76,112 |
| 8/28/2019 | 2,500 | $29.36 | $73,387 |
| 8/29/2019 | 2,500 | $29.68 | $74,200 |
| 8/30/2019 | 2,500 | $29.28 | $73,200 |
| 9/3/2019 | 2,500 | $28.41 | $71,025 |
| 9/4/2019 | 2,500 | $30.56 | $76,392 |

36.     Thus, in total, before the fraud was exposed, he sold 1,599,672 Company shares on inside information, for which he received over $62.2 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

37.     The Prospectus stated the following about Defendant Butterfield:

Mr. Butterfield co-founded Slack and has served as our Chief Executive Officer and as Chairman of our board of directors since February 2009. From April 2005 to July 2008, Mr. Butterfield served as General Manager of the photo-sharing website Flickr at Yahoo! Inc., following Yahoo!'s acquisition of Ludicorp Research and Development Ltd. (which developed Flickr), where he served as Chief Executive Officer from May 2002 to April 2005. Mr. Butterfield holds a Master of Philosophy from the University of Cambridge and a Bachelor of Arts in Philosophy from the University of Victoria.

We believe that Mr. Butterfield is qualified to serve as a member of our board of directors because of his experience and perspective as our Chief Executive Officer and a co-founder.

38.     Upon information and belief, Defendant Butterfield is a resident of California.

**Defendant Shim**

39.     Defendant Allen Shim ("Shim") has served as the Company's CFO since January 2018. According to the Prospectus, as of April 30, 2019, Defendant Shim beneficially owned 2,743,885 shares of the Company's Class B common stock.

40.     For the fiscal year ended January 31, 2019, Defendant Shim received $3,804,874 in compensation from the Company. This included $320,000 in salary, $3,357,900 in stock awards, $122,880 in non-equity incentive plan compensation, and $4,094 in all other compensation.

41.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Shim made the following sales of Class A Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 6/20/2019 | 502,925 | $38.55 | $19,390,273 |
| 7/1/2019 | 3,728 | $38.08 | $141,962 |
| 8/1/2019 | 28,510 | $32.78 | $934,557 |
| 8/12/2019 | 31,795 | $30.65 | $974,516 |
| 9/3/2019 | 4,708 | $28.38 | $133,613 |
| 9/4/2019 | 4,667 | $29.24 | $136,463 |

42.     Thus, in total, before the fraud was exposed, he sold 576,333 Company shares on inside information, for which he received over $21.7 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

43.     The Prospectus stated the following about Defendant Shim:

Mr. Shim has served as our Chief Financial Officer since January 2018. Mr. Shim joined Slack in March 2014 and served as Senior Vice President of Finance and Operations from March 2014 to January 2018. From September 2008 to March 2014, Mr. Shim served as Vice President of Finance and Treasurer at YuMe, Inc., a data analysis company for television advertising that was acquired by RhythmOne in 2017. From March 2005 to September 2008, Mr. Shim worked in business

operations at Yahoo! Inc. Mr. Shim is a Chartered Financial Analyst (CFA) charterholder and holds a Bachelor of Science in Economics from the Wharton School of the University of Pennsylvania.

44.    Upon information and belief, Defendant Shim is a resident of California.

**Defendant Zell**

45.    Defendant Brandon Zell ("Zell") has served as the Company's CAO since April 2019.

46.    During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Zell made the following sales of Class A Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 6/20/2019 | 59,145 | $39.85 | $2,357,223 |
| 7/1/2019 | 2,198 | $37.15 | $81,655 |
| 8/1/2019 | 3,791 | $32.78 | $124,268 |
| 8/15/2019 | 4,850 | $30.08 | $145,888 |

47.    Thus, in total, before the fraud was exposed, he sold 69,984 Company shares on inside information, for which he received over $2.7 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

48.    Upon information and belief, Defendant Zell is a resident of California.

**Defendant Braccia**

49.    Defendant Andrew Braccia ("Braccia") has served as a Company director since March 2010. He also serves as a member of the Compensation Committee. Additionally, since 2007, Defendant Braccia has served as, and is, a partner at Accel, a venture capital firm that controlled the largest ownership stake in the Company prior to the Offering, and which appointed

Defendant Braccia to the Company's Board. According to the Prospectus, as of April 30, 2019, Defendant Braccia beneficially owned 119,928,410 shares of the Company's Class B common stock through his position at Accel and its related entities, which represented 23.8% of the Company's outstanding Class B shares as of that date.

50.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Accel made the following sale of Class A Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 6/20/2019 | 8,500,000 | $39.63 | $336,855,000 |

51.     Accel's insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates Defendant Braccia's motive in facilitating and participating in the scheme.

52.     The Prospectus stated the following about Defendant Braccia:

Mr. Braccia has served as a member of our board of directors since March 2010. Since April 2007, Mr. Braccia has served as a Partner at Accel, a venture capital firm. From 1998 to 2007, Mr. Braccia was Vice President of Yahoo! Search at Yahoo! Inc. Mr. Braccia serves as a member of the board of directors of several private technology companies. Mr. Braccia holds a Bachelor of Science in Business Administration from the University of Arizona.

We believe that Mr. Braccia is qualified to serve as a member of our board of directors because of his significant knowledge of and history with our company, his experience as a seasoned investor and as a current and former director of many companies, and his knowledge of the industry in which we operate.

53.     Upon information and belief, Defendant Braccia is a resident of California.

**Defendant Cooper**

54.     Defendant Edith Cooper ("Cooper") has served as a Company director since January 2018. She also serves as the Chair of the Compensation Committee and the Nominating

and Corporate Governance Committee. According to the Prospectus, as of April 30, 2019, Defendant Cooper beneficially owned 85,446 shares of the Company's Class B common stock.

55.     The Prospectus stated the following about Defendant Cooper:

Ms. Cooper has served as a member of our board of directors since January 2018. From May 1996 to December 2017, Ms. Cooper served in various roles at Goldman Sachs Group, Inc., an investment bank, including Managing Director, Securities Division; Managing Director, Global Head of Human Capital Management; and, most recently, Senior Director. Ms. Cooper serves as a member of the board of directors of Etsy, Inc., a publicly-traded e-commerce company. Ms. Cooper holds a Masters of Business Administration from Northwestern University Kellogg School of Management and a Bachelor of Arts in American History from Harvard University.

We believe that Ms. Cooper is qualified to serve as a member of our board of directors because of her experience as a financial industry executive and her extensive knowledge of that industry and the industry in which we operate.

56.     Upon information and belief, Defendant Cooper is a resident of New York.

**Defendant Friar**

57.     Defendant Sarah Friar ("Friar") has served as a Company director since March 2017. She also serves as a member of the Audit and Risk Committee. According to the Prospectus, as of April 30, 2019, Defendant Friar beneficially owned 406,017 shares of the Company's Class B common stock.

58.     For the fiscal year ended January 31, 2019, Defendant Friar received $3,024,827 in compensation from the Company, which consisted entirely of stock awards.

59.     The Prospectus stated the following about Defendant Friar:

Ms. Friar has served as a member of our board of directors since March 2017. Since December 2018, Ms. Friar has served as Chief Executive Officer at Nextdoor, a social network for neighborhoods. From July 2012 to November 2018, Ms. Friar served as Chief Financial Officer at Square, Inc., a financial services and mobile payment company. From April 2011 to July 2012, Ms. Friar served as Senior Vice President, Finance and Strategy at salesforce.com, inc. Ms. Friar also serves as a member of the board of directors of Walmart Inc., a publicly-traded retail and wholesale operations company. From September 2012 to May 2015, Ms. Friar

served as a member of the board of directors of Model N, Inc., a publicly-traded company providing revenue management cloud solutions for life sciences and technology companies. From June 2014 to April 2018, Ms. Friar served as a member of the board of directors of New Relic, Inc., a publicly-traded provider of real-time insights for software-driven businesses. Ms. Friar holds a Masters of Business Administration from Stanford University and a Masters of Engineering in Metallurgy, Economics, and Management from the University of Oxford.

We believe that Ms. Friar is qualified to serve as a member of our board of directors because of her experience as a public company executive, her extensive finance background, her service as a current and former director of public companies, and her knowledge of the industry in which we operate.

60.     Upon information and belief, Defendant Friar is a resident of California.

**Defendant O'Farrell**

61.     Defendant John O'Farrell ("O'Farrell") has served as a Company director since April 2011. He also serves as a member of the Audit and Risk Committee.  Since 2010, Defendant O'Farrell has served as a general partner at Andreessen Horowitz, a venture capital firm that controlled one of the largest ownership stakes in the Company prior to the Offering, and which appointed Defendant O'Farrell to the Company's Board.

62.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Andreessen Horowitz made the following sale of Class A Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 6/20/2019 | 3,000,000 | $38.80 | $116,415,000 |

63.     Andreessen Horowitz's insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

64.     The Prospectus stated the following about Defendant O'Farrell:

Mr. O'Farrell has served as a member of our board of directors since April 2011. Since June 2010, Mr. O'Farrell has served as a General Partner at Andreessen Horowitz, a venture capital firm. Prior to joining Andreessen Horowitz, Mr. O'Farrell served in various management positions with Silver Spring Networks, Inc., Opsware, Inc., a publicly-traded software company, At Home Corporation, US WEST Inc., and Telecom Eireann, an Irish telecommunications company. Mr. O'Farrell has served as a member of the board of directors of PagerDuty, Inc., a publicly-traded software-as-a-service company that provides a digital operations management platform for businesses, since 2013. Mr. O'Farrell also serves as a member of the board of directors of a number of privately held companies, the U.S. Fund for UNICEF (d/b/a UNICEF USA), and MapLight, a nonprofit research organization. Mr. O'Farrell holds a Masters of Business Administration from Stanford University and a Bachelor of Engineering in Electrical Engineering from University College Dublin.

We believe that Mr. O'Farrell is qualified to serve as a member of our board of directors because of his significant knowledge of and history with our company, his business and venture capital expertise, his extensive experience as an executive and board member of technology companies, and his knowledge of the industry in which we operate.

65.     Upon information and belief, Defendant O'Farrell is a resident of California.

**Defendant Palihapitiya**

66.     Defendant Chamath Palihapitiya ("Palihapitiya") served as a Company director from August 2017 until he resigned on December 4, 2019. Defendant Palihapitiya is the founder and CEO of Social Capital LP, a venture capital firm that controlled one of the largest ownership stakes in the Company prior to the Offering, and which appointed Defendant Palihapitiya to the Company's Board. According to the Prospectus, as of April 30, 2019, Defendant Palihapitiya beneficially owned 50,853,362 shares of the Company's Class B common stock through his position at Social Capital LP and its related entities, which represented 10.1% of the Company's outstanding Class B shares as of that date.

67.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Social Capital LP made the following sale of Class A Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 6/20/2019 | 1,017,067 | $39.30 | $39,971,750 |

68.     Social Capital LP's insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

69.     The Prospectus stated the following about Defendant Palihapitiya:

Mr. Palihapitiya has served as a member of our board of directors since August 2017. Mr. Palihapitiya co-founded Social Capital, a venture capital firm, and has served as its Chief Executive Officer since July 2011. From July 2007 to June 2011, Mr. Palihapitiya worked at Facebook, Inc., a social media and social networking company, where he held various roles, including Vice President, Platform and Monetization and Vice President, User Growth, Mobile & International. Mr. Palihapitiya serves as a member of the board of directors of Social Capital Hedosophia Holdings Corp., a publicly-traded blank check company. Mr. Palihapitiya also serves as a member of the board of directors of several private technology companies. Mr. Palihapitiya holds a Bachelor of Applied Sciences in Electrical Engineering from the University of Waterloo.

We believe that Mr. Palihapitiya is qualified to serve as a member of our board of directors because of his experience as a company executive, his experience as a seasoned investor, and his knowledge of the industry in which we operate.

70.     Upon information and belief, Defendant Palihapitiya is a resident of California.

**Defendant Smith**

71.     Defendant Graham Smith ("Smith") has served as a Company director since December 2018. He also serves as the Chair of the Audit and Risk Committee and as a member of the Nominating and Corporate Governance Committee. According to the Prospectus, as of April 30, 2019, Defendant Smith beneficially owned 210,000 shares of the Company's Class B common stock.

72.     For the fiscal year ended January 31, 2019, Defendant Smith received $1,751,400 in compensation from the Company, which consisted entirely of stock awards.

73. The Prospectus stated the following about Defendant Smith:

Mr. Smith has served as a member of our board of directors since December 2018. Mr. Smith serves as a member of the board of directors of Splunk Inc., BlackLine, Inc., and Xero Limited, all of which are publicly-traded software companies. From March 2015 to February 2019, Mr. Smith served as a member of the board of directors of MINDBODY, Inc., a publicly-traded technology platform serving the fitness, beauty and wellness services industries, which was acquired by Vista Equity Partners in February 2019. From December 2015 to June 2018, Mr. Smith served as a member of the board of directors of Citrix Systems, Inc., a publicly-traded software company providing server, application, and desktop virtualization, and networking. From December 2007 to June 2015, Mr. Smith worked at salesforce.com, inc. serving first as Chief Financial Officer and then as Executive Vice President, Finance. From January 2003 to December 2007, Mr. Smith served as Chief Financial Officer at Advent Software, Inc., a portfolio accounting software company. Mr. Smith qualified as a member of the Institute of Chartered Accountants in England and Wales and holds a Bachelor of Science in Economics and Politics from the University of Bristol.

We believe that Mr. Smith is qualified to serve as a member of our board of directors because of his experience as a current and former director of many public companies, his extensive finance background, including service as a chief financial officer of several large, publicly-traded technology companies, and his knowledge of the industry in which we operate.

74. Upon information and belief, Defendant Smith is a resident of California.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

75. By reason of their positions as officers, directors, and/or fiduciaries of Slack and because of their ability to control the business and corporate affairs of Slack, the Individual Defendants owed Slack and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Slack in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Slack and its shareholders so as to benefit all shareholders equally.

76.     Each director and officer of the Company owes to Slack and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

77.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Slack, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

78.     To discharge their duties, the officers and directors of Slack were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

79.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Slack, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Slack's Board at all relevant times.

80.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the

dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

81.     To discharge their duties, the officers and directors of Slack were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Slack were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Slack's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Slack conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Slack and procedures for the reporting of the business and internal

affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Slack's operations would comply with all applicable laws and Slack's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

82.     Each of the Individual Defendants further owed to Slack and the shareholders the duty of loyalty requiring that each favor Slack's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

83.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Slack and were at all times acting within the course and scope of such agency.

84.     Because of their advisory, executive, managerial, and directorial positions with Slack, each of the Individual Defendants had access to adverse, non-public information about the Company.

85.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Slack.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

86.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

87.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

88.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Slack was a direct, necessary,

and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

89.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

90.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Slack and was at all times acting within the course and scope of such agency.

## SLACK'S CODE OF CONDUCT

91.     The Company's Code of Conduct provides that it "applies to every director, officer, employee, and independent contractor of Slack and its subsidiaries."

92.     In a section titled, "Understanding Insider Trading," the Code of Conduct states the following:

> While working at Slack, you may learn information about Slack, our customers, partners, or other third parties that is confidential. Trading a public company's stock while in possession of material information that is not known to the public is illegal and prohibited by our policies. Consequences for violations are severe, including jail time.
>
> Information is material if a reasonable investor would consider it important in deciding whether to buy or sell a company's securities.
>
> Information that is material and is not available to the public is called inside information. Common examples of inside information include key changes in management, mergers and acquisitions, other major business plans and financial results that have not been released outside the company.

You cannot give inside information to anyone else, either. This is known as tipping, and is also illegal and prohibited by our policies.

The bottom line is: at Slack, no one may buy or sell securities based on inside information, and no one may tip off others to do so. It does not matter how we learned it—using material nonpublic information to make a trade is never acceptable. It violates the law and the trust we have built with our fellow employees, our users, customers, partners, and investors. You are required to keep all customer information, whether or not material, confidential. Please refer to the full Insider Trading Policy for additional information.

93.     In a section titled, "Fair Dealing," the Code of Conduct states the following:

Slack is committed to being honest and truthful with all of its customers, vendors, and other business partners. Never misrepresent the quality, features or availability of our products, and never do anything illegal or unethical to win business.

Trying to obtain information by lying or pretending to be someone you are not is unethical and could be illegal. Do not do it. And if you receive another company's confidential or proprietary information by mistake, return or destroy it. You may also reach out to the Legal team if you have questions.

94.     In a section titled, "Financial Integrity, Records and Accounting," the Code of Conduct states the following:

Slack's books, records, accounts and financial statements must be maintained in appropriate detail so that they properly reflect the Company's business activities. Doing so is required both by law and by the Company's internal controls. Our financial, accounting and legal groups are responsible for procedures designed to assure proper internal and disclosure controls, and everyone must cooperate with these procedures to ensure the integrity of the Company's books, records, accounts and financial statements.

All information must be recorded accurately, whether it is tracking work hours, expenses (including your expense reports) or sales contracts. When these are timely and accurate, we are able to make informed decisions about how to run our business and plan for the future. Our records, including disclosures and filings, must be accurate, complete and timely, so that Slack fulfills its obligations to external stakeholders, including its stockholders.

95.     In a section titled, "Using Company Funds, Assets, and Technology Appropriately," the Code of Conduct states the following, in relevant part:

Since all of these tools and technology belong to the Company, employees should not have any expectation of privacy in their use. Slack may monitor anything created, stored, sent or received on Company technology, to the extent allowed by law. Do not use Company technology to violate the law or Slack policies or to create, store or send content that others might find offensive.

It is also important to carefully avoid any usage that might lead to loss or damage, such as a breach of the Company's IT security protocols.

Company property also includes Slack's brand and reputation, funds, facilities and employee work time.

96.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, and aiding and abetting thereof. Moreover, six of the Individual Defendants violated the Code of Conduct by engaging in insider trading, three of whom did so after the Offering. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

97.     Slack is a San Francisco, California-based software company founded in 2009. The Company's primary offering is a business communication platform, or App, also branded "Slack," intended to replace the use of email within work environments. The Slack App combines team-based instant-messaging functionality with other workplace tools, such as data and file-sharing applications, essentially creating a real-time, virtual office. The App also integrates easily with third-party applications, and provides a directory of over 2,000 of such applications to its users.

98.     Slack's common stock is divided into Class A stock, which confers one vote per share, and Class B stock, which confers ten votes per share. Only the Company's Class A stock is traded publicly; there is no public trading market for the Company's Class B stock. Each share of Class B stock is convertible into one share of Class A stock.

99.     Slack was originally founded as a private company under the name Tiny Speck. Tiny Speck's business model was entirely different from what Slack's business consists of today. The focus of Tiny Speck's business was on developing and launching an online multiplayer computer game called "Glitch."

100.    Glitch launched in September 2011, and was well-received critically, but never grew beyond a small, niche player base. Only a year later, in December 2012, Tiny Speck announced that it would be shutting Glitch down.

101.    Subsequently, Tiny Speck underwent a comprehensive rebranding process, changing its name to Slack, and shifting its focus to the development of the Slack App, which had initially been created as a simple chat tool that the Glitch development team had used to communicate with each other.

102.    The Slack App launched in 2013, and was a quick success, garnering over 60,000 daily users only ten weeks after the App first became available. During this period, the Company raised millions of dollars in financing from various venture capital firms, including Accel, Andreessen Horowitz, Social Capital LP, and their related entities, which would go on to become large shareholders of the Company.

103.    As the App attracted more and more users, the Company began offering different subscription tiers for the App, including (1) a free tier that provides the App's basic features, but charges users for additional services; (2) a standard tier that charges users up to $8.00 per month,

and offers expanded functionality; and (3) Slack Plus, which charges users up to $15.00 per month, and offers a variety of exclusive features not available at the other tiers, including guaranteed uptime. Slack also offers a subscription tier called Enterprise Grid, which is intended for use by large organizations, and allows for interconnectivity between multiple integrated Slack workspaces.

104.    In the years leading up to the Offering, in order to entice more users into purchasing higher-tier paid subscriptions, the Company began including SLAs in Slack Plus and Enterprise Grid subscriptions that provided a 99.99% uptime guarantee. These SLAs were unusual in several respects—namely, most software SLAs offered by competing companies provided uptime guarantees of at most 99.9%, rather than 99.99%, and additionally, whenever there was a service disruption, Slack would automatically pay its customers 100 times the value of lost service in service credits, even to customers who did not experience the disruptions or request refunds.

105.    In early 2019, the Individual Defendants began implementing steps to take the Company public. Rather than opting for a traditional IPO, the Individual Defendants chose to offer Company shares to new investors by way of a direct listing, thereby cutting out the need for underwriters. Structuring the Offering as a direct listing also enabled the Individual Defendants to sell their shares of Company stock immediately through the Offering itself. If the Offering had been structured as an IPO, early investors and Company insiders would have been subject to a lock-up period lasting anywhere between 90 and 180 days before they could sell their shares.

106.    On May 13, 2019, Defendants Butterfield and Shim attended a Slack investor day conference in New York City to discuss the Offering with investors, during which they echoed many of the same statements made in the Offering Documents.[1]

---

[1] https://www.youtube.com/watch?v=KHNQeFpsYdY (last visited April 24, 2020).

107.    Further underscoring the Individual Defendants' desire to sell their Company shares as soon as practicable, on June 5, 2019, Defendant Butterfield sent a letter to the SEC requesting that the effective date of the Registration Statement be accelerated to June 7, 2019, which the SEC granted.

108.    Slack conducted the Offering on June 20, 2019, pursuant to which over 283 million Class A shares priced at $38.50 per share were sold.

### The Individual Defendants' Duty to Disclose

109.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Slack, with respect to their finances and operations. Specifically, Item 303(a)(3) of Regulation S-K required Slack to:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

110.    Additionally, Item 105 of Regulation S-K required the Individual Defendants to include in the "Risk Factors" section of the Offering Documents "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."

111.    As such, the Individual Defendants had a duty pursuant to Regulation S-K to disclose the Company's excessively punitive SLAs, as well as the fact that the Slack App had undisclosed vulnerabilities that would lead to significant service disruptions, and as a result the

Company would be unable to meet its 99.99% uptime guarantee, as these facts constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income, and (iii) significant factors that would make investing in Slack speculative or risky.

### False and Misleading Statements

#### *The Offering Documents*

112.    On April 26, 2019, before the beginning of the Relevant Period, the Company filed the Registration Statement with the SEC, in connection with the Offering. The Registration Statement was signed by Defendants Butterfield, Shim, Zell, Braccia, Cooper, Friar, O'Farrell, Palihapitiya, and Smith. The Company subsequently filed several amendments to the Registration Statement, and the Registration Statement was declared effective on June 7, 2019.

113.    On June 20, 2019, the day the Company's stock began trading on the NYSE, the Company filed the Prospectus with the SEC, in connection with the Offering. The Prospectus formed part of and was incorporated into the Registration Statement.

114.    The Offering Documents discussed in detail the Company's SLAs and the 99.99% uptime guarantees that the Company provided for the Slack App. Specifically, in a section discussing the various risks facing the Company, the Offering Documents described hypothetical risks emanating from, among other things, potential technical difficulties associated with the App leading to service interruptions—implying that such risks had not already materialized.

115.    In a subsection discussing risks pertaining to customer service and satisfaction, among other things, Offering Documents stated the following, in relevant part:

> We have experienced, and expect to continue to experience, rapid growth, which
> has placed, and may continue to place, significant demands on our management
> and our operational and financial resources.  For example, our headcount has grown

from 716 employees as of January 31, 2017 to 1,664 employees as of April 30, 2019.  We have established international offices, including offices in Australia, Canada, Ireland, India, Japan, and the United Kingdom, and we plan to continue to expand our international operations into other countries in the future.  We have also experienced significant growth in the number of users, organizations on Slack and integrations, and in the amount of data that Slack supports.  Additionally, our organizational structure is becoming more complex as we scale our operational, financial and management controls as well as our reporting systems and procedures.

To manage growth in our operations and personnel, we will need to continue to grow and improve our operational, financial, and management controls and our reporting systems and procedures.  We will require significant capital expenditures and the allocation of valuable management resources to grow and change in these areas without undermining our culture, which has been central to our growth so far.  Our expansion has placed, and our expected future growth will continue to place, a significant strain on our management, customer experience, research and development, sales and marketing, administrative, financial, and other resources. ***If we fail to manage our anticipated growth and change in a manner that preserves the key aspects of our corporate culture, the quality of Slack may suffer, which could negatively affect our brand and reputation and harm our ability to attract users, employees, and organizations, and to grow or maintain our Net Dollar Retention Rate.***

In addition, as we expand our business, it is important that we continue to maintain a high level of customer service and satisfaction.  As our paid customer base continues to grow, we will need to expand our account management, customer service and other personnel, our partners, our features, and our security offerings to provide personalized account management and customer service as well as personalized features, integrations and capabilities.  ***If we are not able to continue to provide high levels of customer service, our reputation, as well as our business, results of operations, and financial condition, could be harmed.***

(Emphasis added.)

116.   In a subsection discussing risks pertaining to "quarterly fluctuations" in the Company's results of operations, the Offering Documents stated the following, in relevant part:

Our quarterly results of operations may fluctuate from quarter to quarter as a result of a number of factors, many of which are outside of our control and may be difficult to predict, including, but not limited to:

* * *

- ***security breaches, technical difficulties, or interruptions to Slack resulting in service level agreement credits;***

* * *

> Any one or more of the factors above *may* result in significant fluctuations in our quarterly results of operations.  You should not rely on our past results as an indicator of our future performance.

(Emphasis added.)

117.    In a subsection discussing risks pertaining to, among other things, service outages and performance problems associated with Slack's software platforms, the Offering Documents stated the following, in relevant part:

> Our continued growth depends, in part, on the ability of existing and potential organizations on Slack to access Slack 24 hours a day, seven days a week, without interruption or degradation of performance.  We have in the past and may in the future experience disruptions, data loss, outages, and other performance problems with our infrastructure due to a variety of factors, including infrastructure changes, introductions of new functionality, human or software errors, capacity constraints, denial-of-service attacks, ransomware attacks, or other security-related incidents. In some instances, we may not be able to identify the cause or causes of these performance problems immediately or in short order.  *We may not be able to maintain the level of service uptime and performance required by organizations on Slack, especially during peak usage times and as our user traffic and number of integrations increase*.  For example, we have experienced intermittent connectivity issues and product issues in the past, including those that have prevented many organizations on Slack and their users from accessing Slack for a period of time.  If Slack is unavailable or if organizations are unable to access Slack within a reasonable amount of time, or at all, our business would be harmed.  Since organizations on Slack rely on Slack to communicate, collaborate, and access and complete their work, which in many cases includes entire organizations that complete substantially all of their work functions on Slack, any outage on Slack would impair the ability of organizations on Slack and their users to perform their work, which would negatively impact our brand, reputation, and customer satisfaction, and could give rise to legal liability under our service level agreements with paid customers.
>
> Moreover, we depend on services from various third parties to maintain our infrastructure, including Amazon Web Services, or AWS.  If a service provider fails to provide sufficient capacity to support Slack or otherwise experiences service outages, such failure could interrupt access to Slack by users and organizations, which could adversely affect their perception of Slack's reliability and our revenue and harm the businesses of organizations on Slack.  Any disruptions in these services, including as a result of actions outside of our control, would significantly impact the continued performance of Slack.  In the future, these services may not be available to us on commercially reasonable terms, or at all.  Any loss of the right

to use any of these services could result in decreased functionality of Slack until equivalent technology is either developed by us or, if available from another provider, is identified, obtained, and integrated into our infrastructure. If we do not accurately predict our infrastructure capacity requirements, organizations on Slack could experience service shortfalls. We may also be unable to effectively address capacity constraints, upgrade our systems as needed, and continually develop our technology and network architecture to accommodate actual and anticipated changes in technology.

Any of the above circumstances or events may harm our reputation, cause organizations on Slack to terminate their agreements with us, impair our ability to obtain subscription renewals from organizations on Slack, impair our ability to grow the base of users and organizations on Slack, subject us to financial penalties and liabilities under our service level agreements with our paid customers, and otherwise harm our business, results of operations, and financial condition.

(Emphasis added.)

118.    In a subsection discussing risks pertaining to the Company's SLAs, the Offering

Documents stated the following, in relevant part:

> Certain of our paid customer agreements contain service level agreements, under which we guarantee specified minimum availability of Slack. From time to time, we have granted credits to paid customers pursuant to the terms of these agreements. We do not currently have any material liabilities accrued on our balance sheet for these commitments. ***Any failure of or disruption to our infrastructure could make Slack unavailable to organizations on Slack. If we are unable to meet the stated service level commitments to our paid customers or suffer extended periods of unavailability of Slack, we may be contractually obligated to provide affected paid customers with service credits for future subscriptions***, or paid customers ***could*** elect to terminate and receive refunds for prepaid amounts related to unused subscriptions. Our revenue, other results of operations, and financial condition could be harmed if we suffer unscheduled downtime that exceeds the service level commitments under our agreements with our paid customers, and any extended service outages could adversely affect our business and reputation as paid customers may elect not to renew and we could lose future sales.

(Emphasis added.)

119.    The statements referenced above in ¶¶ 114–118 were materially false and

misleading because they failed to disclose, *inter alia*, that: (1) the Company's Slack App contained

certain vulnerabilities that had already caused significant service outages and other disruptions in

the past; (2) the Company had already failed to meet its promised 99.99% uptime guarantee during seven out of the twelve months in 2018, and would be unable to meet its 99.99% uptime guarantee in the future; (3) the Company's SLAs were highly punitive and unusual for the industry, and during service disruptions provided credits to users worth approximately 100 times the value of lost service, even to users who did not experience the disruptions or request service credits; (4) as a result of the foregoing, the Company's financial results and overall prospects would be heavily impacted; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading.

### **The Truth Gradually Emerges as False and Misleading Statements Continue**

*June 28, 2019 Service Disruption*

120.    Slightly over a week after the Offering, on June 28, 2019, the Slack App suffered a series of service outages lasting approximately 15 hours, affecting users of the App in the United States and Europe. The next day, the Company posted a report on its website summarizing the outages as follows:

> On June 28, 2019 at 4:30 a.m. PDT some of our servers became unavailable, causing degraded performance in our job processing system. This resulted in delays or errors with features such notifications, unfurls, and message posting.
>
> During this time, approximately 10-25% of jobs resulted in errors or failure. By 10:00 a.m. PDT, we fully restored message delivery and reduced the error rates to less than 5% as the team continued to work on a full recovery.
>
> At 1:05 p.m. PDT, a separate issue increased server load and dropped a large number of user connections. Reconnection attempts further increased the server load, slowing down customer reconnection. Server capacity was freed up eventually, enabling all customers to reconnect by 1:36 p.m. PDT.
>
> Full service restoration was completed by 7:20 p.m. PDT. During this period, customers faced delays or failure with a number of features including file uploads, notifications, search indexing, link unfurls, and reminders.

Now that service has been restored, the response team is continuing their investigation and working to calculate service interruption time as soon as possible. ***We're also working on preventive measures to ensure that this doesn't happen again in the future.*** If you're still running into any issues, please reach out to us at feedback@slack.com.

(Emphasis added.)

121.    Various news outlets reported on the outages, including Newsweek, which released

an article stating the following, in relevant part:[2]

Workplace chat application Slack appeared to be suffering an outage today, with issues affecting users across the United States and Europe.

Users on Twitter have reported messages are repeating and showing multiple times after being sent. "Anyone else's @SlackHQ gone all echoey? People are sending things once but it's coming up 2-3 times," one user wrote. The company said was investigating the reports.

\* \* \*

It is not immediately clear if the outages are connected. The company suffered a major outage last year as messages could no longer be sent between users, sparking panic online.

On Down Detector, which tracks website problems, Slack users noted that messages editing also appeared to be impacted by the latest bug. Comments indicated it was down around the world, including Sweden, Russia, Argentina, Italy, Czech Republic, Ukraine and Croatia.

122.    On this news, the price of the Company's stock price fell from $37.50 per share at

the close of trading on June 28, 2019, to $36.55 per share at the close of trading on July 1, 2019,

the next trading day, representing a loss in value of 2.5%. The Company's stock price continued

to fall over the course of the next several trading days, settling at $35.00 per share at the close of

trading on July 8, 2019.

---

[2]    https://www.newsweek.com/slack-down-globaloutage-messages-down-detector-united-states-europe-1446484 (last visited April 23, 2020).

*July 18, 2019 Password Reset*

123.    On July 18, 2019, the Company announced that it would be resetting tens of thousands of Slack App user passwords in response to potentially serious vulnerabilities in the App relating to a 2015 security incident at the Company. The Company discussed the password resets in a post on the Company's website as follows:

> In 2015, unauthorized individuals gained access to some Slack infrastructure, including a database that stored user profile information including usernames and irreversibly encrypted, or "hashed," passwords. The attackers also inserted code that allowed them to capture plaintext passwords as they were entered by users at the time.
>
> * * *
>
> We were recently contacted through our bug bounty program with information about potentially compromised Slack credentials. These types of reports are fairly routine and usually the result of malware or password re-use between services, which we believed to be the case here.
>
> We immediately confirmed that a portion of the email addresses and password combinations were valid, reset those passwords, and explained our actions to the affected users. However, as more information became available and our investigation continued, we determined that the majority of compromised credentials were from accounts that logged in to Slack during the 2015 security incident.
>
> * * *
>
> Today we are resetting passwords for all accounts that were active at the time of the 2015 incident, with the exception of accounts that use SSO or with passwords changed after March 2015. We have no reason to believe that any of these accounts were compromised, but we believe that this precaution is worth any inconvenience the reset may cause. However, we do recognize that this is inconvenient for affected users, and we apologize.

124.    On this news, the price of the Company's stock fell from $33.46 per share at the close of trading on July 17, 2019, to $32.00 per share at the close of trading on July 18, 2019, representing a loss in value of approximately 4.3%.

### *July 29, 2019 Service Disruption*

125.     Despite the Individual Defendants' representations only a month prior that the Company would work to "ensure" that no more large outages occurred, on July 29, 2019, the Slack App suffered from yet another wide-scale service outage across the United States, Europe, and Japan lasting over an hour, and affecting over 2,000 users. The Company reported on the outage on its website as follows:

> On July 29, 2019, at 7:23 a.m. PDT, we made a change that inadvertently caused some performance issues, including messages failing to send. Some customers had trouble accessing their Slack workspaces entirely. By 8:47 a.m. PDT, we identified the cause and reverted the change. The issue was fully resolved by 8:48 a.m. PDT.

126.     On this news, the price of the Company's stock fell from $33.01 per share at the close of trading on July 29, 2019, to $32.58 per share at the close of trading on July 30, 2019, representing a loss in value of approximately 1.3%.

127.     The statements referenced above in ¶¶ 120, 123, and 125 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) the Company's Slack App contained certain vulnerabilities that had already caused significant service outages and other disruptions in the past; (2) the Company had already failed to meet its promised 99.99% uptime guarantee during seven out of the twelve months in 2018, and would be unable to meet its 99.99% uptime guarantee in the future; (3) the Company's SLAs were highly punitive and unusual for the industry, and during service disruptions provided credits to users worth approximately 100 times the value of lost service, even to users who did not experience the disruptions or request service credits; (4) as a result of the foregoing, the Company's financial results and overall prospects would be heavily impacted; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading.

**The Truth Fully Emerges**

*September 4, 2019 Press Release and Conference Call*

128.     Finally, on September 4, 2019, the Company issued a press release disclosing disappointing financial results for the Company's second fiscal quarter of 2020. The press release stated the following, in relevant part:

> "This is an entirely new category of software enabling a once-in-a-generation shift in the way people work together.  We believe channel-based collaboration is so superior to email-based communication for work, that this shift is inevitable," said Stewart Butterfield, Chief Executive Officer and Co-Founder at Slack.  "Customers are choosing Slack because we offer a great user experience, a rich application platform and ecosystem, and a growing network for inter-company collaboration via shared channels."

> "Revenue growth was 58% year-over-year, despite a one-time revenue headwind from credits issued in the quarter related to service level disruption," said Allen Shim, Chief Financial Officer at Slack.  "We remain focused on expansion within existing customers and growing our large enterprise customer base, and ended the quarter with 720 Paid Customers greater than $100,000 in annual recurring revenue, which is up 75% year-over-year."

> * * *

> - Total revenue was $145.0 million, an increase of 58% year-over-year. ***Revenue was negatively impacted by $8.2 million of credits related to service level disruption in the quarter.***

> - Calculated Billings was $174.8 million, an increase of 52% year-over-year.

> - GAAP gross profit was $113.9 million, or 78.5% gross margin, compared to $80.7 million, or 87.7% gross margin, in the second quarter of fiscal year 2019.  Non-GAAP gross profit was $126.3 million, or 87.1% gross margin, compared to $80.7 million, or 87.7% gross margin, in the second quarter of fiscal year 2019.

> - GAAP operating loss was $363.7 million, or 251% of total revenue, compared to a $33.7 million loss in the second quarter of fiscal year 2019, or 37% of total revenue.  GAAP operating loss includes $307.0 million of stock-based compensation and related employer payroll taxes, primarily related to the satisfaction of the performance vesting condition on outstanding RSUs in connection with Slack's direct listing on June 20, 2019.  Non-GAAP operating loss was $55.6 million, or 38% of total

revenue, compared to a $32.0 million loss in the second quarter of fiscal year 2019, or 35% of total revenue.

- GAAP net loss per basic and diluted share was $0.98. Non-GAAP net loss per share was $0.14.

- Net cash provided by operations was $0.3 million, or 0% of total revenue, compared to cash provided by operations of $1.5 million, or 2% of total revenue, for the second quarter of fiscal year 2019.  Free Cash Flow was $(7.9) million, or 5% of total revenue, compared to $(7.7) million, or 8% of total revenue for the second quarter of fiscal year 2019.

\* \* \*

For the third quarter of fiscal year 2020, Slack currently expects:

- Total revenue of $154 million to $156 million, representing year-over-year growth of 46% to 48%.

- Non-GAAP operating loss of $49 million to $47 million.

- Non-GAAP net loss per share of $0.09 to $0.08, assuming weighted average shares outstanding of 544 million.

(Emphasis added.)

129.    That same day, the Company held a conference call to discuss its financial results

for the quarter. During the call, Defendant Shim stated the following, in relevant part:

Turning to Q2.  Results reflect our ongoing progress in what we view as a generational shift from e-mail to messaging and channels.  Total revenues in the second quarter were $145 million, growing 58% year-over-year.  ***Revenue growth was above the high end of guidance despite an $8 million onetime revenue headwind from credits issued in the quarter related to service-level disruption in the quarter***.  Our uptime was 99.9% or 3 nines in the quarter.  But this was below our commitment of 99.99% or 4 nines. ***Service-level disruption of this magnitude is unusual for us.  Compounding the financial impact of the down time was an exceptionally generous credit payout multiplier, and our contracts dating from when we were a very young company.  We've adjusted those terms to be more in line with industry standards while still remaining very customer friendly***.

(Emphasis added.)

130.     Also during the call, Defendant Butterfield revealed the Company's "outrageously customer-centric" and "unusual" policy of distributing credits to customers pursuant to SLAs regardless of whether such customers were affected by outages, stating the following:

> The last thing I want to note though, for the service credits, there is a bunch of things that we do with that are unusual besides what Allen mentioned, which is the payout ratio.  ***One is, customers don't have to request it, we just proactively give it.  And almost no outages, I don't know every detail for this quarter but almost no outages affect all customers, in fact most of them affect like 1% or 0.5% or 3% of customers in any given time.  And we give those service credits to every customer even if they were not specifically affected.  So those policies are outrageously customer-centric, which is part of our background and our orientation***.  And that is one of the reasons you see that effect.  ***It's not necessarily proportionate to the outage***, because if we had the same SLA as Salesforce or Microsoft or any of our peers in the industry, we wouldn't have paid out anything because we would have hit the 3 9 they're committed to, it's our 4 9 and the rest of the policies that make a difference.

131.     In response to an analyst's question, Defendant Shim further noted that the service credits were "more onetime nature," but would create "a headwind in billings for about $5 million and that was reflected in our guidance."

132.     Following the conference call, a number of news outlets reported on these concerning disclosures. For instance, on September 5, 2019, Jonathan Dame, a writer at TechTarget, reported that at the time of the June and July 2019 service outages, the Company's service credits were worth "100 times what each customer paid for the service," stating the following:[3]

> Slack reworked its service-level agreement to be less generous to customers after outages cost the team messaging vendor $8.2 million last quarter.
>
> * * *
>
> [Slack] will no longer pay every customer regardless of whether they were affected by an outage.  Plus Slack will average uptimes over each fiscal quarter, rather than issuing credits each month.

---

[3]     https://searchunifiedcommunications.techtarget.com/news/252470248/Slack-waters-down-cloud-SLA-after-82-million-payout (last visited April 23, 2020).

Slack also reduced its payout ratio. ***It used to provide credits worth 100 times what each customer paid for the service during the time Slack was inaccessibl***e. Moving forward, the credits will be worth 10 times that cost.  As before, the promise applies to customers on Plus and Enterprise Grid subscription plans.

(Emphasis added.)

133.    Also on September 5, 2019, Jordon Novet, a reporter for CNBC, published an article noting that the Company had already failed to meet its 99.99% uptime guarantee during much of 2018, and, as such, the service outages in June and July 2019 were hardly unusual for the Company.[4] The article stated the following, in relevant part:

Slack said on Wednesday that its fiscal second quarter revenue of $145 million was hurt by $8.2 million in credits to customers for service-level disruptions. In other words, revenue could have been 5% higher if not for the problems.

* * *

Slack tried to convince investors that this was a one-time occurrence.

* * *

But Slack's outages last quarter have a historical precedent.

***In 2018, Slack's uptime was below the key 99.99% level for seven out of 12 months, according to the company's online tracker.***

If Slack does not get its outage problem under control, customers could defect to competing services, like Microsoft's Teams.

(Emphasis added.)

134.    On this news, the price of the Company's stock dropped once more, falling over the course of the next two trading days by nearly 12%, from $31.07 per share at the close of trading on September 4, 2019, to $27.38 per share at the close of trading on September 6, 2019. The

---

[4]  https://www.cnbc.com/2019/09/05/slack-says-in-q2-earnings-that-outage-costs-were-one-time-issue.html (last visited April 23, 2020).

Company's stock price continued to plummet the following trading day, closing at $24.92 per share on September 9, 2019.

## DAMAGES TO SLACK

135.     As a direct and proximate result of the Individual Defendants' conduct, Slack will lose and expend many millions of dollars.

136.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against, among others, the Company and the Individual Defendants, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

137.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to certain of the Individual Defendants who breached their fiduciary duties to the Company.

138.     As a direct and proximate result of the Individual Defendants' conduct, Slack has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

139.     Plaintiff brings this action derivatively and for the benefit of Slack to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Slack, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof.

140.    Slack is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

141.    Plaintiff is, and has been at all relevant times, a shareholder of Slack.  Plaintiff will adequately and fairly represent the interests of Slack in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

142.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

143.    A pre-suit demand on the Board of Slack is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following eight individuals: Defendants Butterfield, Braccia, Cooper, Friar, O'Farrell, and Smith (the "Director-Defendants"), and non-parties Sheila Jordan and Mike McNamara (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the eight directors who are on the Board at the time this action is commenced.

144.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact while three of them engaged in insider sales based on material non-public information, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

145.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein.  The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.  As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

146.    Additional reasons that demand on Defendant Butterfield is futile follow. Defendant Butterfield is a co-founder of the Company and has served as the Company's CEO and Chairman of the Board since February 2009. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Butterfield with his principal occupation, and he receives handsome compensation, including $10,347,246 during the Company's fiscal year ended January 31, 2019 for his services. Defendant Butterfield was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Offering Documents, and for failing to correct them. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, both during and after the Offering, which yielded at least $62.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Butterfield is a defendant in the Securities Class Action. For these reasons, Defendant Butterfield breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Braccia is futile follow. Defendant Braccia has served as a Company director since March 2010. He also serves as a member of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Accel's insider sale, which yielded at least $336 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Braccia signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Braccia is a defendant in the Securities Class Action. For these reasons, Defendant Braccia breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.    Additional reasons that demand on Defendant Cooper is futile follow. Defendant Cooper has served as a Company director since January 2018. She also serves as the Chair of the Compensation Committee and the Nominating and Corporate Governance Committee. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Cooper signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Cooper is a defendant in the Securities Class Action. For these reasons, Defendant Cooper breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

149.    Additional reasons that demand on Defendant Friar is futile follow. Defendant Friar has served as a Company director since March 2017. She also serves as a member of the Audit and Risk Committee. Defendant Friar has received and continues to receive compensation for her role as a director as described herein. As a trusted Company director, she conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Friar signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Friar is a defendant in the Securities Class Action. For these reasons, Defendant Friar breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

150.    Additional reasons that demand on Defendant O'Farrell is futile follow. Defendant O'Farrell has served as a Company director since April 2011. He also serves as a member of the Audit and Risk Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded at least $116 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant O'Farrell signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant O'Farrell is a defendant in the Securities Class Action. For these reasons, Defendant O'Farrell breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151.    Additional reasons that demand on Defendant Smith is futile follow. Defendant Smith has served as a Company director since December 2018. He also serves as the Chair of the Audit and Risk Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Smith has received and continues to receive compensation for his role as a director as described herein. As a trusted Company director, he conducted little, if any, oversight of the scheme to make and to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Smith signed, and thus personally made the false and misleading statements in the Registration Statement. Moreover, Defendant Smith is a defendant in the Securities Class Action. For these reasons, Defendant Smith breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on the Board is futile follow.

153.    As described above, three of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Between Defendants Butterfield, Braccia, and O'Farrell and associated venture capital firms, they collectively received proceeds of over $555 million as a result of insider transactions executed during the Relevant Period, including sales executed in connection with the Offering, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

154.    Defendants Friar, O'Farrell, and Smith (the "Audit Committee Defendants") served as members of the Audit and Risk Committee during the Relevant Period. Pursuant to the Company's Audit and Risk Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting processes, the Company's internal controls, and the Company's compliance with applicable law. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes and internal controls, as they are charged to do under the Audit and Risk Committee Charter, allowing the Company to issue false and misleading statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

155.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  For instance, Defendants Butterfield, Shim, and Braccia each served in leadership positions at Yahoo! Inc. between 2005 and 2007.  Additionally, Defendants Friar and Smith both served in senior roles at Salesforce.com, Inc. between 2011 and 2012, including as Senior Vice President, Finance and Strategy and as CFO, respectively. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

156.    Demand is further excused in this case because the Directors, and in particular Defendants Braccia and O'Farrell, are beholden to and depend on Accel, Andreessen Horowitz, and Social Capital LP (the "Venture Capital Firms"). The Venture Capital Firms, which are named as defendants in the Securities Class Action, are significant investors in the Company, and the

Company received millions of dollars in funding from the Venture Capital Firms in the years leading up to the Offering. The Venture Capital Firms were the Company's largest stockholders at the time of the Offering, and through their ownership stakes in the Company, were able to influence the Individual Defendants to initiate the Offering so that the Venture Capital Firms could sell their Company shares and profit thereby. Additionally, Accel and Andreessen Horowitz, respectively, designated Defendants Braccia and O'Farrell to the Board, who receive their primary sources of income from their positions at those firms. Thus, the Directors are unable to evaluate a demand with disinterest or independence.

157.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to make and cause the Company to make, and to fail to correct, materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment.  In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Conduct.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

158.    Slack has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Slack any part of the damages Slack suffered and will continue to suffer thereby.  Thus, any demand upon the Director-Defendants would be futile.

159.   The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

160.   The acts complained of herein constitute violations of fiduciary duties owed by Slack's officers and directors, and these acts are incapable of ratification.

161.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Slack.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of Slack, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Director-Defendants is futile and, therefore, excused.

162.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Slack to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

163.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of them, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants Breach of Fiduciary Duties

164.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

165.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Slack's business and affairs.

166.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

167.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Slack.

168.    In breach of their fiduciary duties owed to Slack, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) the Company's Slack App contained certain vulnerabilities that had already caused significant service outages and other disruptions in the past; (2) the Company had already failed to meet its promised 99.99% uptime guarantee during seven

out of the twelve months in 2018, and would be unable to meet its 99.99% uptime guarantee in the future; (3) the Company's SLAs were highly punitive and unusual for the industry, and during service disruptions provided credits to users worth approximately 100 times the value of lost service, even to users who did not experience the disruptions or request service credits; (4) as a result of the foregoing, the Company's financial results and overall prospects would be heavily impacted; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading.

169.    The Individual Defendants further failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact.

170.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

171.    In breach of their fiduciary duties, six of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact, including three of them who engaged in such insider sales after the Offering.

172.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Slack's securities.

173.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Slack's securities.

174.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

175.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Slack has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

176.     Plaintiff on behalf of Slack has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Unjust Enrichment

177.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Slack.

179.     The Individual Defendants either benefitted financially from the improper conduct, including through insider sales, or received bonuses, stock options, or similar compensation from

Slack that was tied to the performance or artificially inflated valuation of Slack, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

180.   Plaintiff, as a shareholder and a representative of Slack, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

181.   Plaintiff on behalf of Slack has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Abuse of Control

182.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

183.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Slack, for which they are legally responsible.

184.   As a direct and proximate result of the Individual Defendants' abuse of control, Slack has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Slack has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.   Plaintiff on behalf of Slack has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

186.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Slack in a manner consistent with the operations of a publicly-held corporation.

188.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Slack has sustained and will continue to sustain significant damages.

189.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

190.     Plaintiff on behalf of Slack has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

191.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

192.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Slack to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

193.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

194.     Plaintiff on behalf of Slack has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Slack, and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Slack;

(c)   Determining and awarding to Slack the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)   Directing Slack and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Slack and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Slack to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)   Awarding Slack restitution from the Individual Defendants, and each of

them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

Dated: April 27, 2020                          Respectfully submitted,

Of Counsel:                                    **FARNAN LLP**

**THE ROSEN LAW FIRM, P.A.**                   /s/ Michael J. Farnan
Phillip Kim                                    Brian E. Farnan (Bar No. 4089)
275 Madison Avenue, 40th Floor                 Michael J. Farnan (Bar No. 5165)
New York, NY 10016                             919 N. Market St., 12th Floor
Telephone: (212) 686-1060                      Wilmington, DE 19801
Facsimile: (212) 202-3827                      Telephone: (302) 777-0300
Email: pkim@rosenlegal.com                     Facsimile: (302) 777-0301
                                               Email: bfarnan@farnanlaw.com
                                               mfarnan@farnanlaw.com

                                               *Attorneys for Plaintiff*